IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

STANLEY YATES,                    )
                                  )
                                  )
        v.                        )        Case No. 3:05-0546
                                  )
MICHAEL J. ASTRUE,                )
Commissioner of Social Security[1]  )


To:  The Honorable John T. Nixon, Senior District Judge.


**REPORT AND RECOMMENDATION**


The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the

final decision of the Commissioner of Health and Human Services denying Disability Insurance

Benefits ("DIB") under the Social Security Act.[2]

Upon review of the Administrative Record as a whole, the Court finds that the

Commissioner's determination that the plaintiff could perform a light level of work and, therefore,

substantial gainful activity is not supported by substantial evidence in the record as required by

---

[1] Michael J. Astrue is automatically substituted for his predecessor Jo Anne Barnhart as Commissioner of Social Security pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

[2] It is not clear to the Court why this action was filed in this District. The plaintiff is a resident of Van Buren County, in the Eastern District of Tennessee, and his hearings before the ALJ were held in Chattanooga, in the Eastern District. 42 U.S.C. § 405(g) specifically provides that an action for judicial review shall be filed in the district in which the plaintiff resides or has his principal place of business. However, the defendant has not challenged venue and the Court will not address this issue sua sponte.

1

42 U.S.C. § 405(g), and that the plaintiff's motion for judgment on the record (Docket Entry No. 18) should be granted.

# I. INTRODUCTION

The plaintiff filed for DIB on September 17, 2002, alleging disability due to "back - disc & nerves," with an alleged onset date of August 26, 2002. (Tr. 111A, 113.) The plaintiff's application for DIB was denied initially on November 18, 2004, and the request for review was denied on April 27, 2005. (Tr. 4, 12.)

Four hearings were held in front of Administrative Law Judge ("ALJ") Ronald Feibus during 2004. (Tr. 263, 282, 317, 334.) The first hearing was on January 20, 2004, but proceedings were continued so that the plaintiff could retain counsel. (Tr. 263-81.) At the second hearing on April 20, 2004, the ALJ determined that the plaintiff should undergo a psychological evaluation and that a medical expert, specifically a neurologist, should testify regarding the plaintiff's impairments. (Tr. 282-316.) A third hearing was conducted on September 7, 2004 (Tr. 317-33), at which time a rheumatologist testified, and the ALJ adjourned the hearing so that a neurologist could testify about the plaintiff's conjoined nerve condition. (Tr. 327.) The fourth hearing took place on November 2, 2004, at which time neurologist Dr. Alexander Todorov testified telephonically. (Tr. 334-363.) The ALJ issued an unfavorable decision on November 18, 2004 (Tr. 12-24), and the plaintiff filed a request for review on November 23, 2004. (Tr. 11.) On April 27, 2005, the Appeals Council denied the plaintiff's request for review (Tr. 4-6) and the ALJ's decision became the final decision of the Commissioner. (Tr. 4.)

2

## II. BACKGROUND

The plaintiff was born on October 29, 1967, and was 37 years old at the time of the fourth hearing. (Tr. 122.) He completed the twelfth grade, but he was enrolled in special education classes beginning at least by the sixth grade. (Tr. 161.) *See also* Tr. 159-60, 162-66, 256. The plaintiff's past jobs included work as a furniture framer, an oiler on a drag line, and a chain saw operator. (Tr. 126-27.)

### A. Chronological Background: Procedural Developments and Medical Records

The plaintiff presented to Dr. Barrett Heywood, an orthopedist with University Orthopedics in Chattanooga, Tennessee, on August 16, 2001, complaining of lower back pain that had been gradually increasing "for 3 to 4 weeks." (Tr. 174.) The plaintiff attributed his back pain to a fall at work in 1993. (Tr. 174.) On August 18, 2001, the plaintiff's MRI revealed "[e]arly, minimal degeneration of the L4-5 disk." (Tr. 187.) During the year preceding his alleged onset date, the plaintiff made eight visits to Dr. Heywood (Tr. 169-74), four visits to Dr. Thomas Fulbright, a neurologist (Tr. 189-94), and three visits to Dr. William Craig, a rheumatologist, for back pain. (Tr. 194-211.) The plaintiff complained to several physicians of back pain and numbness in his left leg and foot both before and after his alleged onset date. (Tr. 174, 176, 179, 184-88, 190-92,197-98, 202-06, 218-22, 224, 230-333.)

The plaintiff visited Dr. Heywood on August 29, 2002, three days after his alleged onset date, with complaints of swelling and pain in the left side of his back. (Tr. 169.) The plaintiff also reported discomfort in the bottom of his foot and in his fourth and fifth toes, and he had a limited

range of motion in his back due to "tightness." *Id.* He was prescribed Tylenol 2 and told to return to work when he felt "comfortable enough." *Id.*

On November 18, 2002, Dr. Glenda Knox-Carter completed a Residual Functional Capacity ("RFC") assessment apparently based entirely on the medical records provided to her. (Tr. 212-17.) Dr. Knox-Carter determined that the plaintiff could only occasionally lift/carry 20 pounds, frequently lift/carry ten pounds and stand/walk about six hours in an eight-hour workday. (Tr. 213.) She did not find that the plaintiff had any manipulative, visual, communicative, or environmental limitations, but she determined that the plaintiff's ability to balance, stoop, kneel, crouch, and crawl would be frequently limited. (Tr. 213-15.) Without explanation, she also opined that the plaintiff's "allegations of pain are partially credible." (Tr. 216.)

On November 19, 2002, the Tennessee Department of Human Services ("DHS") completed a vocational assessment concluding that the plaintiff could not perform his past relevant work, but that he had the RFC for "light work with postural limitations" and that he could work as a cleaner/housekeeper, thread cutter, or turner. (Tr. 137-38.) DHS completed a second vocational assessment on December 3, 2002, making findings identical to the prior assessment. (Tr. 145-46.) Neither assessment addressed any factors underlying the assessment.[3]

On January 13, 2003, the plaintiff presented to Dr. Dale Ingram, another orthopedist with University Orthopedics, his first medical visit since August 2002. (Tr. 224.) Dr. Ingram reported that the plaintiff "has not worked since August" and that "[h]e says maybe he can go back a couple of hours a day and then he starts having a lot of discomfort in his back." *Id.* The plaintiff revealed that his back pain "has actually gotten worse," that pain runs down his leg, and that he still has

---

[3] The assessment forms did not elicit any explanation for the conclusions reached.

4

numbness and occasional swelling in his left foot. *Id.* Dr. Ingram also discussed an upcoming MRI, the possibility of a chronic pain management program, and prescribed the plaintiff "40 more pain pills." *Id.* Dr. Ingram saw the plaintiff again on January 28, 2003, and recommended pain management if Dr. Fulbright did not believe surgery was appropriate. (Tr. 223.)

Dr. Fulbright examined the plaintiff on March 25, 2003, following a magnetic scan of the lumbar spine. (Tr. 221.) Dr. Fulbright found "some minor degenerative change at the lumbosacral interspace" and possible disc protrusion, and he ordered an "MR scan of the thoracic spine." (Tr. 221-22.) The plaintiff underwent an EMG/Nerve conduction study[4] on April 9, 2003, and it revealed that the "left leg and back muscles are entirely normal." (Tr. 220.) There was "no evidence of any denervation in the femoral nerve or sciatic nerve territory," but the test showed that the plaintiff had "hip algesia[5] in the territory of the left lateral cutaneous nerve of the thigh." *Id.* On April 23, 2003, Dr. Fulbright reviewed the results of the scan with the plaintiff and concluded that he did not have any further diagnostic or therapeutic intervention to offer the plaintiff, but that the plaintiff could return if circumstances changed. (Tr. 218.)

On March 4, 2003, the plaintiff presented to Dr. Craig Humphreys, an orthopedist with the Chattanooga Orthopedic Group,[6] with complaints of pain in his back, lower left extremity, and left hip. (Tr. 248.) The plaintiff also complained that the pain "intensified by sitting, standing, walking, and lying supine;" is worse at night; and nothing alleviates it. *Id.* Dr. Humphreys diagnosed the

---

[4]An EMG is an electromyograph, which is the recording and study of the intrinsic electrical properties of skeletal muscle. Dorland's Illustrated Medical Dictionary 537 (27th ed. 1988) ("Dorland's").

[5]Algesia is defined as "sensitiveness to pain; hyperesthesia." Dorland's at 46.

[6] Apparently, the plaintiff began seeing Dr. Humphreys because Dr. Heywood retired. (Tr. 248.)

5

plaintiff with "low back pain." (Tr. 247.)  At his April 1, 2003, follow-up examination, the plaintiff reported that he had "left foot throbbing and numbness at night" and he rated his pain as a 7 or 8 on a scale of 0 to 10. (Tr. 246.)  Dr. Humphreys opined that a Lumbar Epidural Steroid Injection ("LESI") would help the plaintiff and recommended follow-ups as needed. *Id.*  On June 12, 2003, the plaintiff reported to Dr. Humphreys that the LESI helped the pain and rated his pain as a 5 or 6 on a scale of 0 to 10.  (Tr. 245.)  Dr. Humphreys prescribed a second LESI two weeks after this visit and an office follow-up six months later. *Id.*

Dr. Humphreys completed a "Medical Opinion Form" on June 20, 2003 (Tr. 249-51), indicating that the plaintiff could occasionally lift/carry 25 pounds, frequently lift/carry ten pounds, and stand/walk two hours and sit for four hours in an eight-hour workday. (Tr. 249.) Dr. Humphreys opined that the plaintiff could infrequently bend at the waist or stand on a hard surface, occasionally reach above his shoulders, and frequently use his hands for fine manipulation. *Id.*  Dr. Humphreys also noted that the plaintiff should elevate his lower extremities "if necessary," that he required bed rest at his discretion, and that he needed to rest 15 minutes for every two hours of work. (Tr. 250.) Dr. Humphreys indicated that the plaintiff's subjective complaints seemed reasonable, that he suffered from moderate to severe pain, and that he did not have any environmental restrictions. (Tr. 250-51.)  On June 30, 2003, the plaintiff was prescribed Lortab and Ultram for moderate and severe pain.  (Tr. 244.)

On January 15, 2004, the plaintiff presented to Dr. Elizabeth Turner, a  rheumatologist, for pain in his lower back, left leg, neck, and arm. (Tr. 230.) Dr. Turner diagnosed the plaintiff with "[l]ow back pain with degenerative spine disease; [l]umbar radiculopathy with numbness of the left foot and chronic pain; [b]ilateral carpal tunnel syndrome; [n]eck pain, probable degenerative

6

changes there; [and] [o]veruse syndrome at the elbows with medical epicondylitis." (Tr. 232.)  She recommended that the plaintiff wear wrist splints; have multiple lab exams; get x-rays of the cervical spine, left hip, left foot, and bilateral elbows; and take Relafen.  *Id.*  The x-rays revealed normal conditions except for the spine lumbar x-ray, which revealed mild degenerative disc disease at L5-S1. (Tr. 233-34.)  On January 20, 2004, the plaintiff reported to the emergency room with lower to mid back pain on the left side that the plaintiff rated a 10 on a 10-point scale. (Tr. 226-27.)  He was discharged in stable condition. (Tr. 229.)

On July 1, 2004, Stephen Hardison, M.A., conducted a psychological evaluation of the plaintiff. (Tr. 255, 315.) Mr. Hardison observed that the plaintiff was dressed appropriately, walked with no limp, and his "[f]ine motor skills were adequate for the purpose of this testing." (Tr. 255.) Mr. Hardison reported that the plaintiff "completed high school in special education classes." (Tr. 256.)  The plaintiff stated that he could no longer work due to physical reasons, but when he had worked he completed his job with no supervision. *Id.*  He also reported that, when he initially started his job, he had to be shown several times how to complete a task, but that he eventually would "catch on." *Id.*  The plaintiff stated that while he does not stay in bed all day, he does not engage in any hobbies or complete many chores, and that he cooks "very little." (Tr. 257.)  He also tries "to mow a little but usually cannot complete it." *Id.*  The plaintiff reported that he rarely goes to the store or community activities, but attends church on Sundays. *Id.*

Mr. Hardison conducted a Wechsler Adult Intelligence Scale (WAIS) examination on the plaintiff and determined that he had a verbal IQ of 70, a performance IQ of 79, and a full scale IQ of 72. (Tr. 258.)  He also found that plaintiff had a second-grade reading level and a fifth-grade arithmetic level. *Id.*  The evaluation indicated that the plaintiff had the ability to understand and

7

remember one- and two-step instructions with only minor problems, "sustain concentration and persistence" in a structured work environment with only minor problems, adapt to change in a work environment, travel independently, set goals, and make plans. (Tr. 259.) Mr. Hardison concluded that the plaintiff was within the "borderline range intellectually," but had maintained the same job for 15 years with repetitive instructions. (Tr. 260.)

On July 1, 2004, Mr. Hardison completed a mental Medical Source Statement of Ability to Do Work-Related Activities ("Medical Source Statement") and reported that the effect of the plaintiff's impairments on his ability to understand and remember and carry out short, simple instructions was "none" to "slight," that the effect on his ability to understand and remember and carry out detailed instructions was "slight" to "moderate," and the effect on his "ability to make judgments on simple work-related decisions" was "slight." (Tr. 261.) Mr. Hardison also opined that the plaintiff's ability to interact appropriately with the public was slightly affected by his impairments, the effect of his impairments on his ability to interact appropriately with supervisors, co-workers, and to respond to work pressures was "none" to "slight," and that his ability to respond "appropriately to changes in a routine work setting" was not affected by his impairments. (Tr. 262.)

### B. Hearing Testimony: The Plaintiff and a Vocational Expert

The plaintiff had four separate hearings before ALJ Feibus during 2004. (Tr. 263, 282, 317, 334.) At the first hearing on January 20, 2004, the plaintiff was present, but not represented by counsel. (Tr. 263.) The ALJ told the plaintiff that he could not make a finding of disability based on the medical evidence and record assembled at that time. (Tr. 267, 271.) The ALJ gave the plaintiff 30 days to retain counsel or to proceed without counsel at the next hearing. (Tr. 278-80.)

8

The plaintiff was represented by counsel at the second hearing, held on April 20, 2004. (Tr. 282.) The ALJ reviewed the record and discussed his concerns regarding the lack of evidence in the record, focusing on whether a conjoined nerve can cause the type of pain alleged by the plaintiff and on the reports from various physicians stating that they could do nothing for the pain. (Tr. 285-92.) The ALJ also expressed concern about placing someone in their 30's on disability for the remainder of his work-life. (Tr. 291, 293.) The ALJ suggested that the plaintiff get a WAIS/WRAT test before the next hearing because he might meet a different listing for disability. (Tr. 298.) The ALJ stated that even though Plaintiff had a twelfth-grade education, a psychological exam would show at what grade level he was functioning. (Tr. 301.)

Despite plans to complete a psychological exam before the next hearing, the plaintiff testified at the April hearing that he could read and write his own name and that, when asked to read a newspaper, he "[could] jump and bump through it." (Tr. 301, 303.) The plaintiff reported that Lazy Boy, his former employer, did not have a job that he could perform given his disabilities. (Tr. 304.) He testified that his parents support him "just about 100 percent," but that he lives by himself. (Tr. 305.) The plaintiff's typical day primarily involves sitting outside in the yard, but he does very little yard work. (Tr. 306.) He is able to wash his own clothes, occasionally washes dishes, and has someone else change the sheets on his bed. (Tr. 307.) The ALJ posed a hypothetical job scenario[7] to the plaintiff and asked if he would be able to engage in such work. (Tr. 308-11.) The plaintiff

---

[7] The ALJ's scenario included a factory job with a 15 or 20 minute drive from the plaintiff's house, punching a time card, and working at a table and seated in a chair with a back on it, with the option of sitting or standing. (Tr. 308.) The ALJ explained that "objects [would] come down a roller, kind of a conveyor apparatus, to you and you have some process that you're supposed to do to them with your hands," and used an example of packaging socks in a plastic sack and then placing the sack in a box. *Id.*

9

expressed no objections about trying the job, but stated he didn't know "whether I could stand there or sit there that long until I'd tried it." (Tr. 311.) He elaborated that he was getting stiff at the hearing after being seated for 30 or 40 minutes (Tr. 311) and that he could only envision himself standing at a sink for 15 or 20 minutes. (Tr. 312.) The plaintiff testified he could not bend over, stoop, or squat down to pick up items. (Tr. 313.)

The plaintiff was not present at the third hearing on September 7, 2004, but he was represented by counsel. (Tr. 319.) The ALJ had requested that a neurologist provide the medical expert testimony about the plaintiff's condition,[8] but Dr. Edrick Lopez-Enriquez, a rheumatologist, had been appointed as the medical expert. (Tr. 319-21, 324, 327.) When asked about whether conjoined nerves could cause the plaintiff to be more sensitive to pain than an ordinary person would be, Dr. Lopez stated that he was unaware of such an effect. (Tr. 324-25.) Dr. Lopez testified that a person with degenerative disc disease in the lumbar area of the back would experience pain and that it was reasonable for the plaintiff to be limited in his ability to pick up, lift, or carry objects. (Tr. 326.) The ALJ determined that another supplemental hearing should be conducted to hear the testimony of a neurologist before rendering his decision.[9] (Tr. 332.)

The fourth and final hearing was held on November 2, 2004, with testimony from Dr. Todorov, a neurologist, and Dr. Benjamin Johnston, Ph.D., a vocational expert ("VE"). (Tr. 334-63.) Dr. Todorov testified that conjoined nerve roots could not cause the plaintiff more pain than an ordinary person and that conjoined nerves are not related to the production of pain. (Tr. 342-43.)

_____

[8]The primary issue requiring medical expert testimony was whether or not a conjoined nerve would produce pain. (Tr. 327.)

[9] As he had during the first hearing, the ALJ referenced the plaintiff's younger age as a barrier to receiving DIB several times in this hearing. (Tr. 330-31.)

10

Dr. Todorov believed the pain was due to neuralgia,[10] a condition that is benign but very common in overweight people. (Tr. 344.) He suggested that medication, physical therapy, and weight loss would help the plaintiff's condition improve. (Tr. 346.)

The ALJ questioned the VE about the plaintiff's range of employment opportunities. (Tr. 352.) Dr. Johnston testified that based on the plaintiff's limitations, a decrease in bending or twisting by 66 percent to 100 percent of the day would only limit the plaintiff's light work options by approximately ten percent and that a substantial number of light work jobs would still be available. (Tr. 353-54.) Dr. Johnston further testified that an individual with the plaintiff's IQ scores would be able to perform "SVP 1, 2, and 3 jobs."[11] (Tr. 355.) The ALJ opined that the plaintiff's IQ scores indicating borderline mental retardation are inconsistent with his past work history; independent lifestyle; and ability to raise a family, maintain a driver's license, and pay bills. (Tr. 356-57.) The ALJ further described the plaintiff as follows:

> [T]his is not an intellectually deprived person. He's not the brightest bulb in the candelabra. We started the hearing with that, but he doesn't - - look, the opinion that's available says that he's in the range of borderline and not in the range of mildly mentally retarded. I just - - you know, in order to make that leap, the scores need to be strongly suggested that he is retarded, and he's not. I do believe that he does have a handicap, though, with regard to being able to function, both in the intellectual world and the physical world now. But I just - - he isn't the person - - you know, the person represented by 1205C[12] is an intellectually deprived person who's worked in the past generally, although not always, because sometimes it's

---

[10] Neuralgia is a pinching of the nerve. (Tr. 344.)

[11] SVP is "defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." Dictionary of Occupational Titles 1009 (4th Ed. Rev. 1991). It is measured on a scale from 1-9 on which the higher the number assigned to a job, the greater the skill that is required to perform that job. *Id.*

[12] The ALJ was referring to Listing 12.05C in 20 C.F.R. Pt. 404, Subpt. P, App. 1. *See infra* at 16.

11

applied to SSI cases. But generally, they worked in the past and they're not able to do that work anymore. And this - - that is him, and that's why I was concerned about him. But he's not impoverished in the way that these people are intellectually. They are so limited that they're not able to function and to cope.

(Tr. 357-58.) The ALJ acknowledged that he is required, by law, to consider the plaintiff's IQ scores and whether "those scores are validated by his lifetime and whether or not his adaptive process [has] been impaired." (Tr. 361.) He also stated that the plaintiff "did not lead the life of a mentally retarded or mildly mentally retarded person until this time." *Id.*

## III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable decision on November 18, 2004. (Tr. 15-24.) Based on the record, the ALJ made the following findings:

1.  The claimant meets the nondisability requirements for a Period of Disability and Disability Insurance benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2.  The claimant has not engaged in substantial gainful activity since the alleged onset of disability (20 CFR § 404.1520(b)).

3.  The claimant has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(c).

4.  These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.  The undersigned finds the claimant's allegations regarding his subjective limitations are not totally credible for the reasons set forth in the body of the decision.

6.  The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR § 404.1527).

7.  The claimant has the residual functional capacity described above in the decision (20 CFR § 404.1567).

12

8.      The claimant is unable to perform any past relevant work (20 CFR § 404.1565).

9.      The claimant is a younger individual (20 CFR § 404.1563).

10.     The claimant has a high school special education diploma (20 CFR § 404.1564).

11.     The claimant has no transferable skills from any past relevant work (20 CFR § 404. 1568).

12.     Although the claimant's exertional limitations do not allow him to perform the full range of light work, using Medical-Vocational Rule 202.18, as a framework for decision-making, there are a significant number of jobs in the national economy the claimant could perform.

13.     The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(g)).

(Tr. 23-24.)


# IV.  DISCUSSION

## A.  Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his conclusion. 42 U.S.C.A. § 405(g).  *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases).  The Commissioner's decision must be affirmed if it is supported by substantial evidence, even if the evidence could also support another conclusion. *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999).  Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*). A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C.A. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that he is not engaged in "substantial gainful activity" at the time he seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b) and 416.920(b)). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that he suffers from a "severe impairment." A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.* (citing 20 C.F.R. §§ 404.1520(c) and 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding

14

appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. *Id.* (citing 20 C.F.R. §§ 404.1520(d) and 416.920(d)). The plaintiff may establish that he meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent him from doing his past relevant work, he is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, he must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that he is unable to perform his prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in the national economy. *See, e.g., Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert.*

15

*denied*, 461 U.S. 957, 103 S. Ct. 2428, 77 L.Ed.2d 1315 (1983) (upholding the validity of the medical-vocational guidelines "grid" as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of his functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the plaintiff can perform, he is not disabled.[13] *Id. See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

### B. The Five-Step Inquiry

In this case, the ALJ resolved the plaintiff's case at step five of the five-step process, and ultimately determined that the plaintiff was not under a disability as defined by the Act. (Tr. 16.) At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since August 26, 2002, the alleged onset date of disability. *Id.* At step two, the ALJ found that the plaintiff's degenerative disc disease and borderline intellectual functioning were severe impairments. *Id.* At step three, the ALJ determined that the plaintiff's impairments, either singly or in combination, did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation 4. *Id.* At step four, the ALJ concluded that the plaintiff was precluded from performing his past, relevant work due to chronic complaints of pain. *Id.* At step five, the ALJ found

---

[13] This latter factor is considered regardless of whether such work exists in the immediate area in which the plaintiff lives or whether a specific job vacancy exists or whether the plaintiff would be hired if he applied. *Ragan v. Finch*, 435 F.2d 239, 241 (6th Cir. 1970).

16

that the plaintiff retained the residual functional capacity to perform light work activity with additional limitations. *Id.*

The effect of this decision was to preclude the plaintiff from DIB benefits and to find him not disabled, as defined in the Social Security Act, at any time after August 26, 2002, through the date of the decision.

### C. Plaintiff's Assertions of Error

The plaintiff alleges that the ALJ erred in finding that the plaintiff's combination of medical impairments does not meet the criteria of listing 12.05C. The plaintiff also asserts that the ALJ erred in disregarding the medical opinion of the plaintiff's treating physician, Dr. Craig Humphreys.

The plaintiff contends that he meets the criteria of Listing 12.05C for mental retardation and is entitled to a finding of disability at step three of the five step sequential evaluation process. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C. Section 12.05C provides that

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period (before age 22). . . . The required level of severity for this disorder is met when the requirements in A, B, C, *or* D are satisfied.
>
> * * * *
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]

*Id.* (Emphasis added.) The plaintiff must satisfy not only the specific requirements set forth in section C, but also meet the criteria in the introductory paragraph. *Russell v. Astrue*, 2008 WL 5130103, at *2 (E.D. Tenn. Dec. 4, 2008) (citing *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001) ("[a] claimant must demonstrate that her impairment satisfies the diagnostic description for the listed impairment in order to be found disabled thereunder")). Therefore, to demonstrate a claim of disability under Listing 12.05C, the plaintiff must prove that he exhibited "significantly subaverage general intellectual functioning with deficits in adaptive functioning [that] initially manifested

17

during the developmental period (before age 22)," present "[a] valid verbal, performance, or full scale IQ score of 60 through 70," and demonstrate a "physical or other mental impairment" that significantly limits his ability to work. *Russell*, 2008 WL 5130103, at *2 (citing *West v. Comm'r of Soc. Sec.*, 240 Fed. Appx. 692, 698 (6th Cir. July 5, 2007)); 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C.

The record establishes that the plaintiff has been intellectually challenged for the duration of his life and that he meets the introductory listing requirement that mental deficits manifest before the age of 22. (Tr. 159-66.) The plaintiff's school records illustrate a history of poor or failing grades, and after failing the fifth grade twice, he was socially promoted. (Tr. 164.) His school records also show that he was placed in special education classes in the sixth grade. (Tr. 161.) His high school "studies" were described as being "not on grade level but on Stanley's level of achievement" (Tr. 159), and he graduated high school with a special education diploma. (Tr. 160.) The ALJ disputed the plaintiff's long-term mental retardation by stating that his teachers only indicated that he "made slow progress." (Tr. 20) The ALJ also noted that the plaintiff did not receive any intellectual testing for mental retardation during the developmental period. *Id.* Yet, while a plaintiff "*may* use a qualifying IQ score before the age of 22 to demonstrate that his subaverage intellectual functioning initially manifested during the developmental period, a [plaintiff] is by no means *required* to produce an IQ score obtained prior to the age of 22." *West*, 240 Fed. Appx. at 698 (internal citation omitted) (emphasis in original). The plaintiff's educational records and special education diploma indicate that he was functioning at a subaverage intellectual level before the age of 22, and thus he has satisfied the introductory requirement of Listing 12.05C.

With a verbal IQ score of 70, the plaintiff satisfies the first prong of listing 12.05C. (Tr. 257.) DDS evaluator Stephen Hardison, M.A., conducted a WAIS examination of the plaintiff that revealed he had a verbal IQ of 70, full scale IQ of 72, and performance IQ of 79. (Tr. 256-60.) The WRAT-3 examination supported the WAIS findings, indicating that the plaintiff had a second-grade reading level and a fifth-grade arithmetic level. (Tr. 258.) The plaintiff's reading score placed him

18

in the .08 percentile of the population. *Id.*  Additionally, the ALJ did not suggest that the IQ scores were invalid, and there was no indication that the plaintiff did not put forth the requisite effort during the evaluation. (Tr. 20, 256-60.)

The ALJ's statement that the plaintiff's employment in a semi-skilled, medium exertion job over the prior sixteen years was not indicative of an individual with mental retardation is inaccurate. (Tr. 20.)  The regulation defines a non-severe impairment as "[a]n impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a).  In *Mowery v. Heckler*, the Sixth Circuit held that

> the Secretary's "non-severe" regulation does not define an impairment as non-severe if an individual has worked and functioned with the impairment.
>
> Rather, the regulation states that an impairment is not severe if it does not significantly limit one's ability to do basic work activities.  It does not logically follow from the fact that an individual has worked that such limitations do not exist. It simply establishes that there are at least some jobs the individual has been able to perform.

*Mowery* v. *Heckler*, 771 F.2d. 966, 971 (6th Cir. 1985).  Although prior work can be a factor to consider, it does not "relieve the [Commissioner] from the obligation of evaluating whether the individual may nevertheless have a severe impairment." *Id.*  The Commissioner cannot simply gloss over the plaintiff's long standing mental impairment because he worked in the past and must consider the plaintiff's pre-developmental mental impairment in combination with his other physical or mental problems. *See id.* at 972.

The ALJ also found that the plaintiff's functional abilities are inconsistent with a finding that the he suffers from mental retardation. (Tr. 20-21.)  The ALJ noted that the plaintiff

> admitted he performs household chores including washing the dishes, preparing meals, doing the laundry, shopping for groceries, and mowing the law for short periods of time.  The claimant also reported that he attends church on a regular basis. In addition, the records do not indicate the claimant has experienced difficulty interacting with his treating or examining physicians.  The claimant testified that he lives alone, cares for his personal needs independently, and spends time with a lady friend.  The claimant also reported that he drives his car short distances and visits his parents frequently.

19

(Tr. 21.) (Internal citations omitted.)  However, according to the Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV-TR"), individuals diagnosed with mild mental retardation, the category in which the plaintiff's verbal IQ score of 70 places him, are able to acquire a sixth grade level of education by their late teens and as adults can "achieve social and vocational skills adequate for minimum self-support, but may need supervision, guidance and assistance, especially when under unusual social or economic stress.  With appropriate supports, individuals with Mild Mental Retardation can usually live successfully in the community, either independently or in supervised settings." Am. Psychiatric Ass'n, DSM-IV-TR 43 (4th ed. 2000).  Relying on the third edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM-III-TR"), the Sixth Circuit found that a valid IQ score of 68 was not mutually exclusive of the plaintiff's ability and independence to complete daily activities.[14] *Brown v. Sec'y of Health & Human Servs.*, 948 F.2d 268, 270 (6th Cir. 1991) (citing DSM-III-TR § 317.00 (3d.ed. 1987)).  The Court in *Brown* also noted that "the regulations specify that I.Q. scores ranging from '60 through 70' qualify an individual as mentally retarded."  *Id.* at 270.  Given that the plaintiff's verbal IQ score was 70, the ALJ's finding that plaintiff did not suffer from mild mental retardation because of his daily activities is simply incorrect.  The plaintiff's IQ score, in conjunction with his life-long mental disability, firmly place him within the first prong of listing 12.05C.

The plaintiff also satisfies the second prong of listing 12.05C, which requires him to have a physical or mental impairment that imposes "additional and significant work-related limitation of function." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C.  The ALJ found that the plaintiff's degenerative disc disease and borderline intellectual functioning both qualified as "severe impairments" under 20 C.F.R. §§ 404.1421 and 404.1523.  (Tr. 16.)  The ALJ determined that the

---

[14] The list of activities completed by the plaintiff in *Brown* is fairly similar to the plaintiff's list of activities in this case.  The plaintiff in *Brown* was able to use public transit, hold a driver's license, visit friends, make change at the grocery store, wash laundry, and clean his own room. *Brown*, 948 F.2d at 270.  He also completed the sixth grade, but had a limited level of reading comprehension. *Id.*

20

plaintiff's back pain limited him to light work with restrictions on bending and twisting and precluded him from performing his past relevant work at the "heavy or medium exertion" level. (Tr. 19-23.) Those findings are well-supported by the record. The plaintiff's complaints of lower back and leg pain were recorded as early as August 2001, about one year before the alleged onset date. (Tr. 173.) In August 2002, shortly before plaintiff's alleged onset date, Dr. Heywood opined that the "patient is a bonafide person and is really having pain." (Tr. 170.) The Plaintiff was diagnosed by four different physicians as suffering from degenerative disc disease at L4-5, L5-S1, and he complained of chronic back pain at every visit with physicians. (Tr. 218-22, 230-32, 244-54.) Dr. Ingram also prescribed pain medication and suggested a chronic pain management program for the plaintiff. (Tr. 223-24.)

The ALJ prescribed a set of limitations that not only restricts the plaintiff from performing his past relevant work, but also reduces the level of work he could perform from "heavy or medium exertion" to "light physical work activity." (Tr. 19.) This assigned reduction in work activities satisfies the "additional and significant work-related limitation of function" of the second prong of Listing 12.05C because not being able to perform one's past work and reducing one's overall exertion level are "significant" limitations pertaining to one's ability to perform work. *Compare Mowery*, 771 F.2d. at 972 (finding that the plaintiff's physical impairments that inhibited him from performing heavy labor and limited him to light work with restrictions were significant), *with Gribbins v. Apfel*, 14 Fed. Appx. 491, 492 (6th Cir. July 10, 2001) (finding that the plaintiff's mental impairment was not significant since it did not alter her RFC and that she was able to find a different job in the equivalent category of her past, relevant work). 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C. Webster's Third New International Dictionary defines the word "significant" as "having or likely to have influence or effect: deserving to be considered." Webster's Third New International Dictionary 2116 (1993); *Mowery*, 771 F.2d. at 972. The ALJ's conclusion that the plaintiff's ability to perform work activities was restricted and the record supporting his findings mandates the

conclusion that the plaintiff's physical impairments "significantly" limited his ability to perform work activities and that the plaintiff thus meets the second prong of Listing 12.05C.

The plaintiff's combination of "subaverage general intellectual functioning . . . manifested during the developmental period," qualifying IQ score, and physical limitations that "significantly" restrict his ability to perform medium or heavy-exertion labor meet Listing 12.05C and render him "disabled" as defined by the Act. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C. In light of this finding, it is not necessary to address the plaintiff's remaining assertion of error that the ALJ failed to assign proper weight to the medical opinion of Dr. Humphreys. If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Mowery*, 771 F.2d at 969 ("If at any step in the review the Secretary makes a decision that the plaintiff is or is not disabled, review of the claim ceases."). *See generally Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 393 n.1 (6th Cir. 2008) (if substantial evidence supports a finding that plaintiff is able to perform past relevant work, then the plaintiff's claim is resolved at step four of the sequential review process); *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (resolution of plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

## V. RECOMMENDATION

For the above stated reasons, it is recommended that the plaintiff's motion for judgment on the record (Docket Entry No. 18) be GRANTED and that the decision of the ALJ be reversed and benefits awarded.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of service of this Report and Recommendation, and must state with particularity the specific portions of this Report and Recommendation to which the objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the

District Court's order.  *See Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed. 2d 435 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully Submitted,

JULIET GRIFFIN
United States Magistrate Judge

Case 3:05-cv-00546  Document 24  Filed 08/10/09  Page 23 of 23 PageID #: 103